OPINION
Mary Bell, Administratrix of the Estate of Kevin Bell ("Bell"), deceased, Cynthia Bradley ("Bradley"), and Lynden Bradley, plaintiffs-appellants (collectively referred to as "appellants"), appeal the October 4, 2000 judgment of the Ohio Court of Claims finding that the Ohio Department of Transportation ("ODOT"), defendant-appellee, was not negligent.
On July 21, 1994, Bradley picked up Bell from the Cleveland Hopkins International Airport in her 1986 Pontiac Grand Am, and the two left the airport at approximately 9:15 p.m. Bell decided he wanted to be driven to his parents' house at East 79th Street and Superior Avenue in Cleveland. Bradley drove Bell north on Interstate 71 and then traveled east on Interstate 90 ("I-90"), a portion of which was under construction with a posted speed limit of forty-five m.p.h. There is a dispute as to which lane Bradley was traveling in at the time of the accident and which lanes were open due to the construction. Appellants allege that I-90 is usually comprised of five eastbound lanes, but the fifth, far right lane, was closed for repair. The closed fifth lane ended at the East 55th Street exit, which is the exit before the East 72nd Street exit. Appellants allege that after passing the East 55th Street exit, Bradley continued in the fourth lane, which became the curb lane.
When Bradley reached the East 72nd Street exit ramp, Bell changed his mind and wanted to go to his daughter's home in Cleveland Heights. Bradley, who had slowed down to exit on the East 72nd Street ramp, accelerated while still in the curb lane, and continued toward Eddy Road, which was two exits further east. Bradley continued in the fourth lane and passed the Martin Luther King Jr. Boulevard ("MLK") entrance onto I-90. Bradley maintains that when she passed the MLK entrance ramp, she was suddenly confronted with orange construction barrels that closed the fourth lane for construction with no prior warning or traffic control devices channeling her into the third lane. Bradley testified she continued into the construction area, and collided with another vehicle. At the direction of Bell, she continued traveling forward to avoid another collision, but lost control of her vehicle and went off the right side of the roadway. However, ODOT contends lane four was closed to traffic for several miles before the MLK entrance ramp and Bradley and Bell were actually traveling in the third lane, which was then the curb lane and, thus, were not suddenly confronted with a closed lane and construction at the MLK entrance as Bradley contended. The Court of Claims agreed with ODOT and found Bradley was traveling in the third lane and that after passing the MLK entrance ramp, Bradley's vehicle drifted to the left and collided with a car in lane two, at which point she lost control of her vehicle.
It is undisputed there had been a guardrail removed that morning and/or the previous day at the point Bradley's vehicle exited the road. After exiting the roadway and traveling two hundred and twenty-five feet through a line of construction barrels set at fifty foot intervals, over a ten foot wide shoulder, through a second set of barrels, through a right-of-way fence, over a gravel road, over a pair of railroad tracks, and up a slight grade, Bradley's vehicle came to a rest on a second pair of railroad tracks where it was subsequently struck by a Conrail locomotive traveling fifty m.p.h. Bell died as a result of the collision with the train, and Bradley was seriously injured.
On October 1, 1998, Mary Bell, Kevin Bell's wife, Cynthia Bradley, and Lynden Bradley, Cynthia's husband, filed a complaint against ODOT in the Court of Claims, alleging claims for wrongful death, negligence, and loss of consortium. A trial was held on liability only on May 2, 2000. On October 4, 2000, the trial court issued a decision and judgment in which it found ODOT was not negligent. Appellants now appeal the judgment of the Court of Claims, asserting the following assignments of error:
ASSIGNMENT OF ERROR NO. 1
 THE TRIAL COURT DID NOT BASE ITS RULING ON EVIDENCE PRESENTED AT TRIAL BECAUSE THE EVIDENCE CLEARLY SHOWED THAT THE NEGLIGENCE OF THE DEFENDANT CAUSED THE ACCIDENT.
ASSIGNMENT OF ERROR NO. 2
 THE TRIAL COURT COMMITTED ERROR IN THAT THE COURT DID NOT DECIDE THE NEGLIGENCE OF THE DEFENDANT AS IT APPLIED TO THE PASSENGER IN THAT COMPARATIVE NEGLIGENCE CANNOT BE USED IN APPORTIONING NEGLIGENCE BETWEEN A DEFENDANT AND A PLAINTIFF WHO IS A PASSENGER IN THE AUTOMOBILE WHEN THE PASSENGER DOES NOT PARTICIPATE IN THE OPERATION OF SUCH AUTOMOBILE.
In appellants' first assignment of error, appellants essentially argue that several of the Court of Claims' specific findings were against the manifest weight of the evidence. The standard of review in manifest weight cases has been clearly established. In determining whether the judgment of the trial court is against the manifest weight of the evidence, a reviewing court must be guided by the presumption that the findings of the trial court are correct, as the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80. The Ohio Supreme Court has held that:
 Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus.
In order to prove ODOT was negligent, appellants had to establish by a preponderance of the evidence that ODOT owed them a duty, that ODOT breached that duty, and that the breach of that duty was the proximate cause of their injuries. Littleton v. Good Samaritan Hospital Health Ctr. (1988), 39 Ohio St.3d 86, 92. ODOT has a general duty to maintain and repair state highways. White v. Ohio Dept. of Transp. (1990),56 Ohio St.3d 39, 42. However, ODOT is not an insurer of the safety of the state's highways. Rhodus v. Ohio Dept. of Transp. (1990),67 Ohio App.3d 723, 730.
Appellants first contend the trial court's determination that lane four was closed and that Bradley's vehicle was traveling in the third lane was against the manifest weight of the evidence, thereby not permitting the court to consider other negligent acts flowing therefrom. Appellants maintain the evidence was "overwhelming" that lane four was open when the accident occurred, citing several pieces of evidence: (1) Bradley testified at trial that she was traveling eastbound in the fourth lane; (2) ODOT's construction plans (ODOT CUY-90-18.63 [Part 1]) indicate the fourth lane was to have been open until the MLK entrance ramp, at which point it was to be closed; and (3) the police photographs.
However, the trial court could have found this evidence unpersuasive as to which lane Bradley's car was traveling in at the time of the accident. The trial court could have found Bradley's direct testimony, that lane four was open and that she was traveling in lane four at the time of the accident, unconvincing. Although on direct examination Bradley testified she saw no construction markers until she passed the MLK entrance ramp, her answers on cross-examination were unclear. She did not remember in which lane she was driving except to say the "far right" lane. Further, with regard to Bell changing his mind about exiting at East 72nd Street, the following exchange took place:
 Q. So you never got onto the ramp, exit ramp at 72nd Street; is that your testimony?
A. Right.
 Q. So lane 4, there were barrels in lane 4, and you were in lane 3, and you never got out of lane 3. Is that what your testimony is?
A. I don't know the lanes by number.
 Q. It was the farthest lane to your right when you were driving. We'll call that lane 4. And there were barrels in it. Is it your testimony you were in lane 3 coming up to the ramp and that you never got in the exit ramp and continued in lane 3, the open lane?
A. Yes.
From this exchange, it appears as though Bradley admitted there were orange barrels in the fourth lane, that lane four was closed, and that she continued in the third lane after passing the exit for East 72nd Street. In addition, Bradley specifically testified she has suffered memory problems as a result of the accident and several of her answers were vague as to the events immediately before the accident. The Bratenahl Police Department report, appellants' Exhibit 41, indicates that during an interview of Bradley in the hospital, sixteen days after the accident, Bradley's "standard answer" to all questions was "I don't know" or "I don't remember anything at all." The trial court was in the best position to view the witnesses and determine their credibility. Given Bradley's rather confusing testimony and admitted memory problems, the trial court could have reasonably found Bradley's testimony not credible.
As for ODOT's construction plans, whether the original plans called for the fourth lane to be open until the MLK entrance ramp is irrelevant as to what circumstances actually existed at the time of the accident and cannot be persuasive in attempting to determine Bradley's actions and which lane she had been traveling in. Therefore, we find ODOT's construction plans unpersuasive insofar as appellants claim that lane four was open at the time of the accident.
With regard to the police photographs taken at the scene on the night of the accident, we find the trial court could have reasonably found them inconclusive on this issue. Appellants contend it is apparent from the police photographs "that there were no barrels present that were necessary to carry out such closure of lane four at the location of the accident." Our review of the photographs establishes that it is difficult to determine exactly what relevance they have, given that they were apparently taken at the point of the accident facing east and, thus, would not demonstrate whether lane four was closed west of the MLK entrance ramp. The testimony presented at trial, with regard to the pictures, does not elucidate this issue. Ronald Valdman, a project engineer for ODOT at the time of the accident, found the photographs difficult to decipher at trial. Further, the photos do not indicate the demarcation of lanes clearly to determine the relative positioning of the barrels present in each of the picture frames.
In addition, ODOT claims Bradley's careening vehicle displaced several of the barrels during the accident, rendering the photographs misleading. Neither the police report nor the testimony at trial clearly establishes how many construction barrels the vehicle struck before swerving off the roadway. The Bratenahl police investigation report states the vehicle "struck a construction barrel," and Bratenahl Police Sergeant Joseph Fischbach testified the vehicle struck "barrels," although neither is clear as to whether these were the barrels marking the closure of the fourth lane or marking where the guardrail had been removed. The diagram on the accident investigation report, appellants' Exhibit 51, does not indicate that any barrels were struck. However, appellants' Exhibit 63, a police photograph, shows some debris, which may be a piece of a flattened orange construction barrel. Adding to the uncertainty of this issue is appellants' Exhibits 1, 2, and 3, which show the vehicle veering from the third lane into the closed fourth lane after the third barrel, while the accident investigation report shows the vehicle veering into lane four after the fifth barrel. The report also is unclear as to whether any additional barrels were present farther west. We also note appellants' Exhibit 10, a police photograph of the scene, seems to demonstrate that a number of barrels had been moved by police or were struck, as there is a large gap of barrels along the edge of the roadway. Valdman opined the same. Also, in Exhibit 10, the tip of one barrel to the west is just visible behind the hood of a police cruiser in the foreground, indicating that the barrels may continue westward beyond the frame of the picture. Thus, from our review of the police photographs, we cannot say whether the construction barrels demonstrate the fourth lane was open or closed prior to the MLK entrance ramp.
We also note that appellants' expert accident reconstruction witness, Henry Lipian, testified with regard to his reconstruction efforts and his placement of orange-barrel symbols on his court diagram (appellants' Exhibits 1, 2, and 3) that there was no factual data documenting what traffic control devices were present west of the accident scene, so he did not include any in his diagrams. Lipian stated that in making his court diagram of the accident scene, he reviewed ODOT's construction plans, the police reports, the police photographs, and a bevy of other evidence presented by appellants at trial. Despite having such evidence at his disposal, he was still unable to determine where the barrels were actually placed west of the accident. He reiterated his inability to determine this several times during his testimony. Likewise, upon reviewing such evidence, we are unable to determine whether lane four was closed west of the accident location and Lipian's diagrams of the accident scene are not helpful.
The trial court did not explain the reasoning behind its finding that lane four was closed at the time of the accident, merely stating such in conclusory terms in its factual summary; however, the trial court could have reasonably relied upon the testimony of several witnesses to find that lane four was closed. Dennis J. O'Neil, a work zone traffic control engineer for ODOT, Valdman, and Kevin A. King, a transportation engineer for ODOT, all testified that the closure of the fourth lane began approximately one and one-half to three miles before the MLK bridge and was marked off by orange construction barrels. In addition, the police report indicates Bradley was traveling in the third lane, although it is unclear how long she had been traveling in the third lane and whether she entered the third lane only after turning sharply from the fourth lane after encountering the construction barrels. However, considering all of the evidence presented at trial, the trial court could have relied upon the testimony of ODOT's engineers and found that the fourth lane was closed and Bradley and Bell had been traveling in the third lane at the time of the accident.
Appellants next argue ODOT was negligent because its agents failed to immediately place temporary concrete jersey barricades at a location it knew was a high accident area based upon available statistics. Our analysis closely follows that of the Court of Claims. First, we agree with the Court of Claims that the notes in ODOT's construction plans do not require the placement of a concrete barricade at the location of the accident. Page twenty-six of the Project 794-93 "Traffic General Notes" provides the circumstances under which the contractor must provide various protective measures when removing a guardrail. It is undisputed that the fourth lane was closed at the actual point of the accident after the MLK entrance. Therefore, because the lane closest to the guardrail was closed, the following section on page twenty-six entitled "Maintaining Traffic Public Safety" applies:
 WHEN THE LANE ADJACENT TO THE GUARDRAIL IS CLOSED TO TRAFFIC THE PROVISIONS OF PARAGRAPH "A" ABOVE SHALL APPLY AFTER 1 DAY. THE PROVISIONS OF PARAGRAPH "B" ABOVE SHALL APPLY AFTER 10 DAYS AND THE PROVISIONS OF PARAGRAPH [sic] "C" ABOVE SHALL APPLY AFTER 15 DAYS.
The parties agree the portion of the guardrail removed from the area of the accident was removed either the day before or the day of the accident. As did the trial court, we assume, arguendo, that the guardrail was removed the day before. Notwithstanding, appellants contend ODOT should have complied with paragraph C, which required temporary concrete barriers, because ODOT knew in advance that the work on the guardrail would not be completed for over fifteen days. The Court of Claims found the traffic notes do not require such, and found the construction plans must be interpreted to apply on a day-to-day basis. We agree. The passage states that "THE PROVISIONS OF PARAGRAPH [sic] `C' ABOVE SHALL APPLY AFTER 15 DAYS." The passage does not state that the provisions of paragraph C shall apply if the contractor determines before removing the guardrail that the guardrail repair cannot be completed in fifteen days. For this court to read such a requirement into the passage would be a strained construct. The plain language seems to require only that the requirements of paragraph C come into effect "after" fifteen days have expired. O'Neil and King also testified that there would be no requirement for concrete jerseys until after the fifteenth day.
We agree with the Court of Claims that such circumstances require the application of paragraph A, which provides that where an existing guardrail has been removed, the contractor is required to provide orange construction barrels with steady burning warning lights placed at fifty-foot intervals at least two feet from the edge of the roadway. Appellants do not dispute ODOT placed orange barrels with steadily burning signals at fifty foot intervals at the location of the missing guardrail. Thus, ODOT complied with paragraph A and its Traffic General Notes by placing orange construction barrels with steadily burning lights at fifty foot intervals at the site where the guardrail had been removed.
Appellants also argue that, nevertheless, ODOT has the authority to recognize special and unique conditions and to change the construction plans if necessary to make the area safer. Valdman testified ODOT had such authority. Thus, appellants maintain that because ODOT was aware the location of the accident had been a high accident area for a number of years, it should have placed temporary concrete barriers where the guardrail had been removed in order to protect the motoring public from the railroad tracks.
Appellants presented an Ohio Department of Public Safety traffic crash listing for two hundred ninety-four crashes that took place on I-90 from 1988-1994, in the eastbound direction within one hundred yards of the accident in question. Prior occurrences are admissible for the purpose of showing the existence of a danger. Patton v. Cleveland (1994),95 Ohio App.3d 21, 31. "[I]n order for such occurrences to have been admissible to show prior knowledge on the part of [the defendant], these incidents must have occurred under circumstances substantially similar to those in [the plaintiff's] case." Renfro v. Black (1990), 52 Ohio St.3d 27,32. The trial court has the discretion to determine whether the prior occurrences were substantially similar to the accident in question. Patton, supra, at 32. Furthermore, the proponent of prior occurrence evidence has the burden of showing the substantial similarity of the circumstances. Id.
Appellants' argument is grounded upon the supposition that due to the large number of accidents which have occurred in the same immediate area, concrete barriers should have been placed on the side of I-90 to protect motorists from driving into the path of the railroad tracks. However, the compiled statistics presented to the court cannot demonstrate ODOT should have placed the concrete barriers in place of the guardrail in order to protect vehicles from oncoming trains, as none of the accidents cited involved similar circumstances. The compiled statistics contain numerous types of traffic incidents with varying descriptions, including failing to maintain an assured clear distance ahead, failing to control the vehicle, failing to yield while merging, striking fixed objects, stopping illegally in traffic, sideswipe passing, load shifting, changing lanes with a vehicle defect, traveling at an unsafe speed, pedestrian actions, colliding head-on, debris in highway, and illegally parking a vehicle.
It is difficult to extrapolate from these incidents involving such widely differing underlying circumstances that it would be unreasonably unsafe to temporarily replace a guardrail with signaled orange construction barrels. These unrelated statistics would be largely irrelevant to demonstrate that ODOT was aware that not replacing the guardrail with a concrete barrier would present a danger of vehicles colliding with oncoming trains. Appellants' expert, Lipian, admitted he could not find any other accidents in which a vehicle left the side of the road and ended up on the railroad tracks. Further, despite the trial court's finding on this issue and its citation to the requirements of Renfro, supra, appellants failed to address the issue of substantial similarity of these prior accidents in their brief. We agree with the Court of Claims that appellants have failed to sustain their burden of demonstrating a substantial similarity between the previous accidents and the one at issue. Therefore, we find that it was within the trial court's discretion to find evidence of prior accidents irrelevant to the present case.
Appellants also argue ODOT had a general duty to protect motorists on I-90 from the parallel train tracks. In Feichtner v. Ohio Dept. of Transp. (1995), 114 Ohio App.3d 346, we discussed ODOT's duty to the traveling public in construction zones. We recognized ODOT cannot guarantee the same level of safety during a highway construction project as it can under normal traffic conditions. Id. We further acknowledged ODOT is still required to provide the traveling public with a reasonable degree of safety in construction zones by utilizing traffic control barrels, reducing the applicable speed limit, and erecting construction warning signs. Id. In addition, we found that a court must look at the totality of the circumstances in determining whether ODOT acted sufficiently to render the highway reasonably safe for the traveling public during the construction project. Id.; see, also, Lumbermens Mut. Cas. Co. v. Ohio Dept. of Transp. (1988), 49 Ohio App.3d 129.
In support of their argument that ODOT owed a duty to protect motorists from the railroad tracks, appellants presented deposition testimony from a related civil case filed against several road construction companies, the motorist that collided with Bradley, and Conrail. However, the testimony of these individuals is not persuasive on the duty of ODOT, and they were not qualified as experts. The only evidence presented on this issue was the testimony of ODOT's engineering expert witness, Dr. Russell Lewis, who testified that to a reasonable degree of engineering probability, there were no applicable traffic and engineering standards and guidelines that would have required the erection of a concrete barrier at the location of the accident to protect motorists from the railroad tracks. He stated the railroad tracks were well beyond the thirty foot "clear zone" and the right-of-way, and there is no warrant for a barrier to protect traffic from the railroad line. Lewis further testified that the guardrails currently on I-90 near the accident location are in place to protect against other hazards, not the railroad tracks. Finally, Lewis opined that all of the traffic controls, including the barrels, their spacing, and their steady C-beam, conformed to all applicable standards, warrants, and guidelines of the highway engineering profession. Viewing the totality of the circumstances, we agree that ODOT provided a reasonable degree of safety in the construction area, and appellants' argument is without merit.
We also note appellants assert a brief argument that ODOT was negligent by causing a "conflict" at the entrance ramp from MLK. Appellants contend ODOT breached its duty of care by unreasonably shortening the MLK entrance ramp and forcing motorists entering I-90 from MLK to quickly merge through lane four and onto the highway without sufficient distance to gain speed to merge with the regular traffic flow. However, there is no evidence that merging traffic from MLK contributed to the present accident in any manner. Bradley specifically testified she did not see any cars merging from MLK onto I-90. Therefore, this argument is without merit.
After reviewing the evidence and the entire record in this case, we find that there was competent, credible evidence to support the Court of Claims finding ODOT was not negligent. Therefore, we find the trial court's finding on this issue was not against the manifest weight of the evidence, and appellants' first assignment of error is overruled.
Appellants argue in their second assignment of error that the trial court erred in its alternative finding regarding their comparative negligence. We have already found that the trial court did not err in finding that ODOT was not negligent. Therefore, the issue of appellants' comparative negligence is moot, and we decline to address it. See App.R. 12(A)(1)(c).
Accordingly, appellants' first assignment of error is overruled, their second assignment of error is rendered moot, and the judgment of the Ohio Court of Claims is affirmed.
 __________________ BROWN, J.
LAZARUS and BOWMAN, JJ., concur.